IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**JIMMY SHIPLEY,**

    **Plaintiff,**

vs.          No.  01cv0880 JHG

**JOANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (Shipley's) Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, for a Rehearing **[Doc. No. 9]**, filed June 12, 2002. The Commissioner of Social Security issued a final decision denying Shipley's application for disability insurance benefits and supplemental security income.  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to reverse and remand is not well taken and will be DENIED.

### I.  Factual and Procedural Background

Shipley, now twenty-six years old, filed his application for disability insurance benefits on September 28, 1998, and filed for supplemental security income on September 16, 1998, alleging disability since August 10, 1998, due to fatigue and shortness of breath as a result of tricuspid valve replacement secondary to endocarditis, chronic renal failure and chronic headaches. Tr. 15. Shipley has a tenth grade education and past relevant work as a cook and as an assistant manager at a fast food restaurant.  On April 25, 2000, the Commissioner's Administrative Law Judge

(ALJ) denied benefits, finding that Shipley's impairments were severe but did not singly or in combination meet or equal in severity any of the disorders described in the Listing of Impairments, Subpart P, Appendix 1. The ALJ further found Shipley could not perform his past relevant work but retained the residual functional capacity (RFC) to perform the full range of sedentary work. Tr. 16.  As to his credibility, the ALJ found Shipley's testimony was not wholly credible.  Tr. 15. Shipley filed a Request for Review of the decision by the Appeals Council.  On March 16, 2001, the Appeals Council denied Shipley's request for review of the ALJ's decision.  Tr. 5.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes. Shipley seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Barker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative

evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson v. Sullivan*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show he is not engaged in substantial gainful employment, he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to

the Commissioner to show the claimant is able to perform other substantial gainful activity considering his residual functional capacity, age, education, and prior work experience. *Id.*

In support of his motion to reverse, Shipley contends the ALJ's conclusion that his nonexertional impairments did not significantly erode his work capacity and thus he could perform a full range of sedentary work is not supported by substantial evidence and is contrary to law. Additionally, Shipley argues the ALJ erred in applying the Medical-Vocational Guidelines (the grids) because his nonexertional impairments precludes the mechanical application of the grids, and therefore the ALJ should have consulted a vocational expert (VE). Finally, Shipley contends the ALJ's credibility determination is not supported by substantial evidence.

Shipley contends the ALJ failed to consider his nonexertional complaints. Shipley's nonexertional complaints include fatigue, shortness of breath, dizziness, and headaches. The ALJ found Shipley had retained the RFC for sedentary work because his nonexertional impairments did not significantly erode his ability to perform a full range of sedentary work. The ALJ discounted these complaints because he found they were not supported by the evidence, at least not in the disabling degree alleged. In support of this finding, the ALJ stated:

> Following his release from the hospital, he has had very few problems, and there is no evidence that his heart surgery was not successful. His bioprosthesis is in good position and there is no evidence it is malfunctioning. His recent echocardiogram showed no abnormalities. He required almost no treatment from June 1999 to his last visit to his doctor in November 1999. While the claimant describes difficulties with daily activities requiring exertion due to fatigue and shortness of breath, he describes his lifestyle as sedentary in nature. Moreover, although he testified that he gets "body cramps" if he sits for too long, there is no evidence that he has any medical condition reasonably expected to cause body cramps, and he does not allege that a short period of stretching would alleviate whatever symptoms he is experiencing after having been in a seated position for a prolonged period.

Tr. 15. The record reflects the following:

On August 10, 1998, Shipley was admitted to University Hospital for acute bacterial endocarditis of the tricuspid valve with sepsis. Tr. 125. On August 14, 1998, Shipley's creatinine rose from a normal level to 2.3 and was diagnosed with acute renal failure, secondary to acute tubular necrosis. On August 15, 1998, Shipley had a tricuspid valve replacement. Tr. 123. On August 19, 1998, Shipley's creatinine continued to rise to a level requiring dialysis. Shipley required daily dialysis until August 23, 1998. Because Shipley required six weeks of IV antibiotic therapy, his physicians determined it was best for him to remain hospitalized due to his lack of funding for outpatient nursing. Tr. 118. On September 14, 1998, Shipley no longer required dialysis. The last two weeks of Shipley's hospitalization "were largely stable as he stayed on 7 South, saw the physical therapist daily and was encouraged to ambulate." *Id.* On September 27, 1998, Shipley completed his six week course of IV antibiotics and was discharged. Shipley informed his physicians that he was moving to Colorado to be with his brother. Tr. 119. On September 28, 1998, Shipley's physicians released him "on his on recognizance to go to Colorado with his brother" and provided him with a one month supply of Coumadin. *Id.* Shipley's physician instructed him to contact a physician of his choice once he reached Colorado in order to have the physician monitor his Coumadin therapy as he would require this for the rest of his life.[1] *Id.*

On November 9, 1998, Shipley sought medical treatment from Dr. Thomas Verme. Tr. 149. Shipley told Dr. Verme he had been under the care of a doctor in Colorado. At that time,

---

[1] Coumadin is an anticoagulant indicated for the prophylaxis treatment and/or treatment of the thromboembolic complications associated with atrial fibrillation and/or cardiac valve replacement. *Physician's Desk Reference* 929 (53rd ed. 1999).

Shipley reported having no problems. *Id.* Dr. Verme instructed Shipley to return for a follow-up examination in two weeks. *Id.*

On November 30, 1998, Shipley returned to see Dr. Verme. Tr. 147. Shipley complained of having left chest wall pain for three days. Dr. Verme noted Shipley had some tenderness and diagnosed him with musculoskeletal pain. Dr. Verme reassured Shipley.

On December 7, 1998, Shipley returned to see Dr. Verme. Shipley reported that he continued to have chest wall pain and shortness of breath at times. *Id.* Dr. Verme noted Shipley had no other complaints. Dr. Verme urged Shipley to follow-up with his cardiologist.

On December 21, 1998, Shipley returned to see Dr. Verme. Tr. 146. Shipley reported having problems with insomnia and feeling like he had bugs crawling all over him. *Id.* Dr. Verme noted no problems with Coumadin, no bleeding, no chest pain, and no shortness of breath. The only problem Shipley complained about on that day was an upper respiratory infection, mild and resolving. *Id.* Shipley denied significant stress, however, Dr. Verme noted "overall seems anxious re: health hx & conditions." *Id.* Dr. Verme prescribed a trial of Elavil to help Shipley with his insomnia. Dr. Verme also instructed Shipley to return if he had any problems otherwise he could return in four weeks.

On January 18, 1999, Dr. Thomas Verme evaluated Shipley and noted "no physical problems." Tr. 144. Shipley reported he had no shortness of breath, no chest pain, no bleeding and no other complaints. *Id.* On that day, Shipley stated he was still too tired to work and requested a "letter for disability." *Id.* The physical examination revealed an elevated blood pressure but no edema. *Id.* Dr. Verme assessed Shipley as stable and noted he would write a letter for disability purposes for "2-3 mos max." *Id.*

On January 19, 1999, Dr. Verme wrote the letter in support of disability. Tr. 150. Dr. Verme indicated Shipley had not fully recovered from his surgery due to the short period of time after the surgery. Dr. Verme clearly limited Shipley's eligibility to ninety days, at which time he would re-evaluate Shipley. *Id.* Dr. Verme further opined that Shipley would be able to resume gainful employment at the end of the ninety days. *Id.*

On February 1, 1999, Shipley returned for his follow-up with Dr. Verme. Tr. 173. Shipley reported no problems. Shipley informed Dr. Verme that he was doing well and was walking for exercise. Shipley also reported he was going to school in order to receive his GED. The physical examination revealed no edema of the extremities, a normal blood pressure and a stable weight. Dr. Verme instructed Shipley to return for a follow-up in four weeks. Dr. Shipley also instructed Shipley to continue with his exercise and with his schooling. *Id.* Dr. Verme also noted "letter for soc svc written." *Id.*

On March 3, 1999, Shipley returned for his follow-up. Tr. 171. At that time, Shipley was having problems with an ingrown toenail. Dr. Verme noted Shipley looked well and had no other complaints. Dr. Verme prescribed antibiotics and instructed Shipley to return on March 8 for a bilateral toenail removal. *Id.*

On March 8, 1999, Shipley returned for his bilateral toenail removal. Tr. 169. Shipley reported receiving his GED and discussed his plans to start college for a counseling degree. *Id.* Dr. Verme noted Shipley had no other complaints. *Id.*

On March 10, 1999, Shipley returned to see Dr. Verme because he was having bleeding from his toenail removal. Tr. 167. Dr. Verme stopped the bleeding with silver nitrate and applied

a dressing.  Dr. Verme noted no other complaints or problems and instructed Shipley to return in one week for a follow-up.

On March 15, 1999, Shipley returned for his follow-up and reported no further bleeding from his toenail removal.  Tr. 167.  Shipley reported feeling better and had no other complaints.  Dr. Verme noted Shipley looked well and instructed him to return in 2-3 weeks.  *Id.*

On April 7, 1999, Shipley returned for his follow-up.  Tr. 164.  Shipley reported having problems with headaches and an occasional "strange numbness" of his left leg.  Dr. Verme opined the headaches were "typical tension headaches" and recommended a "trial OTC NSAIDS (over the counter nonsteriodal anti-inflammatory drug)" such as Aleve, no aspirin and relaxation.  *Id.*

On May 5, 1999, Shipley returned for his follow-up and reported his headaches were better and that he was doing well.  Tr. 161.  Dr. Verme noted Shipley had no chest pain, no shortness of breath, and no other complaints.  Dr. Verme noted that Shipley still hadn't had a follow-up with his doctors in Albuquerque because he could not get a ride.  *Id.*

On May 18, 1999, the record indicates that Shipley's medical records from Western New Mexico Medical Group were sent to the following agencies: (1) Disability Determination Services in Albuquerque; (2) McKinley County ISD; and (3) Division of Vocational Rehabilitation.  Tr. 213.

On May 18, 1999, Dr. Verme wrote a second letter in support of disability.  Tr. 160.  Dr. Verme noted some progress since his January letter but opined Shipley had not yet fully recovered.  Dr. Verme recommended Shipley receive state assistance for an additional ninety days and indicated he would reevaluate Shipley's condition at the end of this period.  Dr. Verme again

opined that Shipley would be able to resume gainful employment at the end of the ninety day period.  *Id.*

On June 2, 1999, Shipley failed to show up for his follow-up appointment with Dr. Verme. Tr. 213.  On June 7, 1999, someone at the clinic noted that Shipley could not be reached at his telephone number.  A letter was sent informing Shipley he had been rescheduled for a June 11, 1999 appointment.  *Id.*

On June 18, 1999, Shipley returned to see Dr. Verme.  Tr. 214.  At that time, Shipley reported feeling well.  Dr. Verme noted Shipley had no bleeding, no chest pain, no shortness of breath and no problems with his Coumadin.  Shipley reported he had started school and was excited about "moving forward."  *Id.*  Shipley also reported he was separated from his new wife and was experiencing some stress but was managing.  Notably, Shipley had no other complaints. Dr. Verme noted he congratulated Shipley on starting school, counseled him and offered assistance.  *Id.*  Dr. Verme scheduled Shipley for a four week follow-up but advised him he could return sooner if needed.  *Id.*

On July 15, 1999, Shipley did not show up for his four week follow-up visit.  Tr. 214. Shipley was given another appointment for July 23, 1999.

On August 19, 1999, Shipley returned for his blood work.  Tr. 211.  However, Shipley did not return for his scheduled September 16, 1999 follow-up appointment with Dr. Verme.  The medical records indicate that someone sent a letter to Shipley informing him he had been rescheduled for his follow-up on September 30, 1999.  *Id.*

On November 5, 1999, Shipley called the clinic because he needed a prescription for Coumadin.  Tr.212.  Dr. Verme authorized the prescription for Coumadin and informed Shipley

he had to keep his follow-up appointment the following Monday, November 8, 1999. *Id.* Shipley did not keep this appointment and was therefore scheduled for November 30, 1999. On November 12, 1999, Shipley informed someone at the clinic that he was receiving his medical care at another clinic.

On October 9, 2000, Dr. Thomas E. Robinson, a physician at the Rehoboth McKinley Christian Health Clinic, submitted a "To Whom it May Concern" letter stating in pertinent part:

> The patient has problems with peripheral neuropathy, particularly in his legs where he has painful sensations in his legs and now also in his arms. He has gotten some benefit with Amitriptlyline but is still bothered with his condition. For a number of reasons Mr. Shipley is disabled and unable to work. As a result of his open heart surgery and sternotomy he should not be doing any heavy lifting or straining his chest. He has limited capabilities for exertion because of his prosthetic valve. He cannot handle heavy equipment or dangerous machinery because he is on Coumadin. His peripheral neuropathy prevents him from being on his feet for long periods of time. I feel that his conditions are permanent and totally disabling.

Tr. 235. This letter was not before the ALJ but submitted to the Appeals Council by Shipley and made part of the record. Tr. 7. At the April 25, 2000 Administrative Hearing, Shipley testified he been evaluated by Dr. Robinson for the first time one week prior to the hearing. Tr. 46. Additionally, Shipley testified he had a follow-up appointment with Dr. Robinson for December 2, 2000.

On November 8, 1999, at Dr. Robinson's request, Dr. Anandan Swaminathan, a cardiologist and internist, evaluated Shipley for "tiredness and exhaustion." Tr. 199. Dr. Swaminathan also ordered an echocardiogram. Tr.206. Dr. Swaminathan's report indicates Shipley had no complaints of chest pain, shortness of breath, palpitations, syncope (fainting),

swelling of his ankles, claudication,[2] amaurosis fugax,[3] and transient ischemic attacks. Tr. 199, 201. On the "Systems Review" portion of the history, Dr. Swaminathan checked everything as normal except, of course, for the cardiovascular system. Tr. 202. The physical examination reflected no cardiovascular distress except for a left systolic murmur, a normal vascular system, normal respiratory system, normal abdomen, no neurological deficits, and no pedal edema. Tr. 203. Dr. Swaminathan assessed Shipley as (1) status post tricuspid valve replacement– valve dysfunction to be ruled out; and (2) tiredness and exhaustion probably secondary to residual RV (right ventricle) dysfunction. Tr. 204. Dr. Swaminathan recommended an "annual echo examination and prophylaxis for SBE (subacute bacterial endocarditis)." *Id.* Dr. Swaminathan also noted that Shipley was to follow-up with Dr. Robinson. The echocardiogram report indicated the "bioprosthesis in TV (tricuspid valve) position; in good alignment." Tr. 206. The echocardiogram also indicated "normal LV (left ventricle) function was seen; normal RV(right ventricle) function was noted." *Id.*

On February 9, 1999, Dr. Aida Recalde, an agency nonexamining consultant, completed an RFC Assessement form and opined Shipley retained an RFC for light work. Tr. 152. However, the ALJ found Shipley could perform a full range of sedentary work. The ALJ opined that substantial evidence supported an RFC for sedentary work and was supported by Dr. Recalde's opinion. Tr. 15. The ALJ further found Shipley's "nonexertional factors [had] not

---

[2] Claudication is a condition caused by ischemia of the muscles, characterized by attacks of lameness and pain, brought on by walking, chiefly in the calf muscles but may occur in other muscle groups. *Stedman's Medical Dictionary* 3500 (26th ed. 1995).

[3] Amaurosis fugax is a transient blindness that may result from a transient ischemia due to carotid artery insufficiency. *Stedman's Medical Dictionary* 55 (26th ed. 1995).

significantly eroded this work capacity." *Id.* Substantial evidence supports these findings. The record indicates that Dr. Verme, Shipley's treating physician, opined that Shipley's headaches were tension headaches treatable with over-the-counter medication and relaxation. Tr. 164. After following Dr. Verme's treatment plan for his headaches, Shipley reported he was doing well and his headaches were better. Tr. 161. A review of the medical evidence also indicates that on December 7, 1998, Shipley complained to Dr. Verme that he had "shortness of breath at times." Tr. 147. However, on other visits to Dr. Verme, Shipley did not complain of shortness of breath. Tr. 149, 147, 146, 144, 173, 171, 169, 167, 161, 214. The record does not reflect that Shipley ever complained of dizziness to his physicians. He did testify at the administrative hearing regarding his dizziness. Tr. 34, 40, 45. However, the ALJ may discount nonexertional impairments when not supported by objective evidence. *Diaz v. Secretary of Health & Human Servs.*, 989 F.2d 774, 777 (10th Cir. 1990).

     As to his complaints of fatigue, early in his recovery Shipley reported to Dr. Vinson, the agency examining medical consultant, that he tired easily. Tr.127-129. Dr. Vinson examined Shipley on October 28, 1998, approximately two months after his surgery and four weeks after he was discharged from the hospital. Dr. Vinson noted Shipley was experiencing "a tachycardia of 102" and "appeared to be genuinely short of breath and limited in what activity he is able to do." Tr. 129. Dr. Verme's medical records also indicate Shipley complained of "being too tired to work" on January 19, 1999, and requested a letter for disability. Tr. 144. However, on other visits to Dr. Verme, Shipley did not complain of being fatigued, tired or exhausted. Tr. 149, 147, 146, 173, 171, 169, 167, 164, 161, 214. In fact, on February 1, 1999, Shipley reported he was doing well, walking for exercise and going to school. Tr. 173. On March 8, 1999, Shipley

reported he had completed his GED and planned to enroll in college.  Tr. 169.  Additionally, Dr. Verme's notes are clear that he would write a letter in support of disability for a 2-3 month period at the most and opined Shipley would be able to resume gainful employment at the end of the ninety days.  Tr. 144, 150.  On May 18, 1999, Dr. Verme submitted a second letter in support of disability for another ninety days and again made clear Shipley "would be able to resume gainful employment at the end of this period."  Tr. 160.

A treating physician may offer an opinion about a claimant's condition and about the nature and severity of any impairments.  *Castellano v. Secretary of Health and Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994).  The regulations provide that the agency generally will give more weight to medical opinions from treating sources than those from non-treating sources and that the agency will give controlling weight to the medical opinion of a treating source if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."  20 C.F.R. § 404.1527(d)(2).  In this case, Dr. Verme's opinion is supported by the medical evidence.

The ALJ did not have Dr. Robinson's October 9, 2000 letter before him, however, it was before the Appeals Council.  The record to be considered on review includes all of the evidence before the Appeals Council, including any new evidence that was not before the ALJ.  *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994).  In his letter, Dr. Robinson opined that Shipley's "conditions are permanent and totally disabling."  Tr. 235.  However, a treating physician's opinion that a claimant is disabled is not dispositive because final responsibility for determining the ultimate issue of disability is reserved to the Commissioner.  20 C.F.R. §§ 404.1527(e)(1),

416.927(e)(1), *see also, Castellano*, 26 F.3d at 1029.  Dr. Robinson's medical opinion is also not supported by the evidence.

Dr. Robinson referred Shipley to Dr. Swaminathan for assessment of Shipley's complaints of fatigue.  Dr. Swaminathan's evaluation does not support Dr. Robinson's finding of peripheral neuropathy.  Dr. Swaminathan found no neurological problems and no shortness of breath.  Dr. Swaminathan suspected Shipley's tiredness and exhaustion was "probably secondary to residual RV dysfunction." Tr. 204.  However, the echocardiogram indicated a "normal RV function."  Tr. 206.  In response to a letter from Shipley's counsel regarding Shipley's complaints of extreme fatigue and his need to nap three times a day, Dr. Swaminathan responded that it was "highly likely" that those symptoms were related to his prior heart valve infection.  Tr. 197.  Her evaluation and the echocardiogram do not support her opinion.

Finally, the ALJ found Shipley's testimony regarding his nonexertional impairments was not supported by the evidence in the disabling degree alleged and therefore lacked credibility.  Credibility determinations are peculiarly the province of the finder of fact and will not be upset when supported by substantial evidence.  *Diaz v. Secretary of Health and Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990).  However, "[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988).  In this case, the ALJ linked his credibility determination to substantial evidence and will not be disturbed.

Because substantial evidence supports the ALJ's finding that Ripley's nonexertional impairments had not significantly eroded his work capacity for sedentary work, he was not precluded from relying on the grids.  *See, Thompson v. Sullivan,* 987 F.2d 1482, 1488 (10th Cir.

1993)( the grids may still be used if a claimant has nonexertional impairments which do not significantly reduce the underlying job base); *see also Glass v. Shalala*, 43 F.3d 1392, 1394 (10th Cir. 1994)(grids may be used where the ALJ finds, based on substantial evidence, that the nonexertional impairments do not affect residual functional capacity).

The Court is mindful that in reviewing the record, it is precluded from reweighing the evidence or substituting its judgment for that of the Commissioner. *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991). As long as substantial evidence supports the ALJ's determination, the Commissioner's decision stands. *Hamilton v. Secretary of Health & Human Servs.*, 961 F.2d 1495 (10th Cir. 1992). Applying this standard, the Court finds that based on the record as a whole the ALJ's decision that Shipley was not disabled is supported by substantial evidence and must be affirmed.

A judgment in accordance with this Memorandum Opinion will be entered.

/s/ Galvan

**JOE H. GALVAN**
**UNITED STATES MAGISTRATE JUDGE**